I think that a jury is required to find not only who the victim is, but also what the amount is, and that's in a jury setting. In this case, trial counsel asked for a jury trial on the matter of restitution. And that motion was denied. Do you have any authority for the latter point, in terms of the amount, any case that indicates that that's a jury issue? Well, I think because of the fact that it is, assuming that restitution is a punishment, assuming that restitution fits within the Sixth Amendment framework, then the amount of punishment is something that would have to be decided. You're saying it just flows from that, but there's no case law that says that, right? No case law that I'm aware of. Do you agree that the four cases, I assume you were here listening to what I said to the other counsel, the four Ninth Circuit cases that deal with these two statutes, do you believe that those cases would need to be overruled by an en banc court in order for you to get the result that you're seeking here? Without commenting on the power of the panel, I would think that that would be the appropriate venue. Okay, so you agree. Because we're a three-judge panel, we're limited to that. In order for you to get the result you want, we need to ask the court to go en banc and get the requisite vote to do that, right? Again, I don't want to say that the panel doesn't have power. No, I understand. I'm just saying, under Miller v. Gammie, that's what we have to do, right? That's correct. Okay. I think you've got a good point in terms of the amount that was awarded here, the $1.2 million. The evidence is very, very weak, and I want to ask the government about that. But do you have anything to add to what opposing counsel said before? Your argument is somewhat parallel to his, is it not? I think ours is a little bit different because it's in the Mandatory Victim Restitution Act, so that's slightly different. Right. And the facts and circumstances of our case were different because he pled to a non-conspiratorial count, count 13, that was limited to 24,180 disclosed Social Security numbers. So it was a precise amount. There couldn't be a finding of Bank of America being a victim in that case because one of their Social Security numbers wasn't released. So the court then went beyond that and then found that they were a victim under the Restitution Act. Right. So it's different in that sense. I think it's also different because trial counsel in this case asked for a jury trial on those precise issues, and that was denied. Right. I think it's also different in the sense that the evidence that was introduced by the attorney that was representing Bank of America was without any kind of substantiation. To me, that's your strongest point, is the latter point. But as far as the former is concerned, I realize we're dealing with a different statute, but it's two sides of the same hole, basically. We have case law that says that it doesn't fall within the area that you're talking about. I gather you're agreeing that the three of us have no authority independently to overrule our case law. We would have to go on bunk, and Southern Union is theoretically the linchpin for that to happen. Is that correct? Again, I want to say that you have the power to do what you need to do. We don't. But I understand what the court is asking me. So under those circumstances, that's true. But I do think Southern Union opened up the door for that, as we talked about. And I have a slightly different sense of Booker. In one of the recited two law review articles, one note and one law review article. We don't read law review articles. I understand. Nobody does except people in the academy. That's not true. There's an occasionally good law review article. I did. Nothing's categorical. Nothing's categorical. If it's in your brief and it's useful, we'll look at it. And I looked at it. And what they kind of mentioned in there, and I looked back at Booker. Was it in the good law review? It was in Fordham. That's a good law review. Okay. And they say that Booker removed any mention of a statutory maximum when it reaffirmed the apprendee holding. Booker stated that the fact which is necessary to support a sentence exceeding the maximum authorized by the facts admitted by the defendant or proved to a jury beyond a reasonable doubt. And I do think. This was written by a student or a faculty member? This particular one was written by. It's a note. So it's a student, right? A law student. I could have learned a law student, but nonetheless. One was a note. One was an article. But they both talk about the fact that Booker made a distinction with Apprendi and Blakely and not focusing on the statutory maximum, but on the facts of what have to be proved, which dovetails into the situation that we have here where the judge found that Bank of America was a victim when Bank of America was never involved in any aspect of the case. In the plea agreement that was entered into by Mr. Robolo, the fact is that the government says that they want the opportunity to argue restitution of the $1.2 million as it goes to Countrywide. And Countrywide was bought out by Bank of America after Mr. Robolo had disclosed what he had done. After Countrywide had been sued. Let me just ask you, if it turned out we disagreed with you and that there was a basis, industry or otherwise, for giving notice for protection purposes of $1.2 million, then what's your argument on the amount of restitution? Well, I think it has to be tied to what he pledged to. Well, if in fact, though, that there was this disclosure and you have all the customers, whether or not they're Social Security numbers, I'm just saying, if there's a basis for saying that there's $1.2, and I know you disagree with that, but if there were a basis for saying there's $1.2 million, do you still have an argument as to whether the amount of restitution was appropriate or inappropriate? Well, I think it's inappropriate for a couple of reasons. One of them we mentioned is that the court makes a determination using a 48-percent mailing. There's no evidence at all that these were mailed first class. I don't know whether these could be done bulk rate or not, but there's no evidence of that fact. And at the time that the notices were mailed, the postage rate, as we indicated, was $0.42 per stamp. So it would seem that the most that Mr. Rabola could have been ordered to pay was $21,000 for the notices that were sent to the 50,000 persons he admitted to having disclosed their Social Security numbers to. How do you get that? Well, how do you limit it to those people? I mean, his plea agreement said quite clearly that he was responsible for all the notices, for all the victims. Well, the plea agreement says that the defendant agrees that in compliance with his obligations, the government is going to argue restitution, right? But the defendant reserves the right to argue that he is not obligated to pay restitution for these sums or any other or at all. He made specific reservations against the restitution. So it doesn't say the defendant agrees that the amount of restitution is not restricted to the amount alleged in the count to which the defendant is pleading guilty, and may include losses arising from charges not prosecuted pursuant to this agreement, as well as all relevant conduct in connection with those charges. That's part of the plea agreement, right? Right. But the court does not, as it does with the sentencing aspect of it, talk about the fact that that could include restitution. So, for example, defendant agrees... I have no idea what you just said. Defendant agrees, however... I'm sorry. I have no idea what you just said. You just said a sentence. It makes no sense at all. Does he agree that this could be held responsible for these other losses? In the context of sentencing, not in restitution. It says restitution. Defendant agrees that the amount of restitution is not restricted. I mean, how much clearer can he be when it says restitution? Are we looking at the same language? Because in the agreement, defendant reserves the right to argue that he is not obligated to pay restitution for these sums or any other or at all. I don't think the plea agreement... Well, that's perfectly fine. He can argue anything he wants to. He can argue for no punishment whatsoever. But what does that have to do with the authority of the court to impose restitution for the greater amount? You said the most the court could impose was the $21,000. It's just clearly not right. He took responsibility here for restitution for whatever loss the court found. But there was no notice to him of what the amount of restitution was going to be imposed by the court. The court made the determination of $1.2 million based upon what it is Bank of America's attorney argued at the time of the sentencing. There was nothing in the plea agreement that said that the court is going to consider, like, the maximum term of sentence of three years, the maximum fine, the maximum period of... He signs a plea agreement that says I am possibly responsible for this. Why isn't that enough notice? So then he's ready. You know, they present whatever proof they present. Because he has signed on to a possibility that he will have to pay restitution for more than that. Because that is the background to his plea to a specific count, count 13, that only involves $24,000. But this says you might have restitution beyond that. So why doesn't that open up, doesn't that give him notice? His lawyer should have told him, by the way, you know, when we get to the hearing, be aware that they could bring in this other proof because, look, you said restitution could be for more than that. Because there's no notice of what that amount would be when he enters the plea agreement. If he had entered the plea agreement and the court at that time... So what? So what? Had said... So what? You... So what? He would have said no. But he didn't say no. He said, I am responsible for possibly more, much more than this. Because he didn't know... He didn't say no. He could have said no. He didn't say no. But you can't ask whether he would have said no or not without telling him the amount that he was ultimately... Oh, absolutely you can. Absolutely you can. He can just say, we don't know what the amount is, but you might be responsible for more. And when we get to the hearing, you'll find out what that more is. If you don't want to take that risk, that's fine. You go to trial. But don't sign this plea agreement. I don't read Apprendi in those cases as being... It has nothing to do with Apprendi. It has to do with his own plea agreement. Having such an open-ended kind of vacuum, if you will. It seems to me that under these cases, there has to be some notice of the amount that he could be exposed to in order for it to be valid. So I think under that circumstance, you have to go to the count. And what do you base that on? Huey? You can plead away any constitutional rights at all. This is the way it is. You can plead away your Fifth Amendment rights not to testify against yourself. You can plead away your right to a jury. You can plead away all sorts of stuff in the Constitution, all sorts of rights you have. So long as you enter an agreement, you can agree to anything, pretty much. So as long as there's a factual basis for the plea. Yes. But here they're clear on the factual basis of the plea. But beyond that, he's got a lawyer. But you know what those are. Sometimes you know what they are. Sometimes you have no idea what they are. Sometimes you don't find out what they are until you get to the sentencing. A lot of times you don't. And that's the way it is. Life is uncertain. Life is particularly uncertain when you're charged with crimes. And that's the way it goes. Lots of people plead guilty in the face of uncertainty in order to reduce uncertainty oftentimes. But there was no reduction of uncertainty. If he pled to one count, he may as well have pled to the sheet because ultimately what he ended up getting was the same sentence that he would have got if he had pled to all of it. And the restitution would have been the same as if he had pled to and I distributed not only $24,100. It sounds to me like he had bad legal advice, that whoever advised him to take this plea deal didn't. Anyway, why don't we hear from the government now? Here we go. It's time. Please, the court, Angela Davis for the United States. Good morning. I'd like to first address, since some questions have been raised for it, the support that was in the record for the $1.2 million restitution award. There has been an argument presented to this court that the restitution award was loosely based on the victim impact letter's representation that the victim had suffered a $1.2 million loss. In fact, the victim impact letter identified a loss of over $18 million, and that respectfully excluded litigation costs. The $18 million was comprised of the cost of notifying individuals whose records were impacted by the security breach, as well as setting up an 800-call center and offering free credit monitoring services. Let me focus on something slightly different, if I may, Ms. Davis. As I viewed the record, it looked to me like the $1.2 million figure came from an unsworn victim impact statement submitted by B of A's counsel, in which he claimed that the bank incurred $1.2 million mainly in mailing costs. He testified he didn't have personal knowledge of the accuracy of the figure, and that the B of A employee from whom he quoted the figure may have compiled it from other sources as well. But he didn't know exactly where. Then it seems like the PSR was involved, and that only seemed to recite costs from the victim impact statement. I don't find any evidence on the record that the probation officer relied on any affidavit or sworn statement by any representative of the B of A. So basically, we have this vacuum. Nobody knows where the figures came from. Now, they may be ascertainable, but at least what I'm seeing, they're just nothing to get your teeth into. I realize the evidentiary bar is very low for this, but there's got to be something. What is it that the court relied upon other than the two things that I mentioned? First of all, the plea agreement Exhibit A, apart from the restitution waivers, which have already been discussed in the colloquy with Judge Kaczynski, Exhibit A to the plea agreement, the defendant specifically stipulated that he downloaded, in addition to 50,000 profiles, which without question included Social Security numbers, he downloaded over 2 million additional profiles that included personal information of the victims. That was stipulated to you in the plea agreement. In addition, in the pre-sentence report, the defendant himself described his conduct as a data breach in his confession. Okay, let's concede all of that's correct. We still have to quantify the costs. He estimated that he downloaded 20,000 profiles per week for a period of two years. It's also in the pre-sentence report that he opened up a separate bank account to receive profits from the sale of the data, and that in that bank account there was approximately $400,000, and that was a bank account that the pre-sentence report characterized as the defendant having admitted that he opened to receive the proceeds from the sale of the data at a rate of $500 per 20,000 profiles. When you do the math on what was in the bank account, the number of profiles is far greater than 2 million. It's close to 7 million. Did the district court refer to that? It did not explicitly refer to that. It was definitely in the government's papers that this was a massive data breach, and we did refer to his own estimates of how much data was downloaded, namely the 20,000 per week. All of that is kind of irrelevant. The only evidence on cost of mailing is the counsel's statement, and then, of course, the testimony at the hearing, which basically echoes what Judge Smith said. He didn't know how it was calculated. He looked to Ms. Buffert, I believe it was, from the bank. So this notion of how much it costs to mail makes common sense, but is there anything in the record about that? There's not. Certainly the record could have been more specific. Is there anything in the record on that? First of all, just let me just say that he did refer to it as a team effort, and he was in a little bit of an uncomfortable position because he was counsel of record to the multi-district litigation. And certainly the record could have been more fleshed out. Let's go back to the question. Was there anything in the record on the amount it costs to mail for getting the number that are being mailed? It was the estimate of the number multiplied by the postage plus ancillary costs. And I thought we didn't, that there really wasn't, that that was sort of a backing into it. Is there anything testified to as to what the postage cost was? The cost of postage was not testified to. That's correct. I mean, I have no doubt that if this were to go back, that it could be reconstructed. But the problem is, there's one piece of paper where the guy says, oh, it's $1.3 million. I have no exact idea how we got there, but it was a team effort. And then now we have kind of an after-the-fact reconstruction. And as counsel points out, we don't know if it was, you know, did they do e-mail mailings? Did they do bulk mailings? Was it 42 cents? Was it 48 cents? You know, it might make a little bit of difference. I don't know. I mean, even on these numbers, I think you have about a $100,000 to $250,000 gap. So what's your response? I mean, is that enough? Well, I'm sorry, Judge Kuczynski. No, go ahead and ask Judge McGoon's questions. One thing that I would like to mention is that up until the day of sentencing or just the eve of sentencing, the fact that $1.2 million was expended to notify impacted individuals was really not questioned. Indeed, it's in the defense's sentencing papers, and I would refer specifically to pages 285 and 289 of the excerpt of record, in which he says there's an issue as to whether or not the $1.2 million expended was reasonably foreseeable. He wasn't really challenging the amount. Was there an objection to the amount? There was not an objection to the pre-sentence report specifically to that. There was cross-examination. So we review for plain error? Excuse me? What do we review for plain error? Yes, we actually have suggested other issues. Or is it invited error, which is an even higher standard? I think there was cross-examination of the victim, and so I guess there was an implicit preservation of the victim's credibility. Well, I mean, the idea of objecting a trial is that you can, or the trial court, is that you can bring in more evidence if the objection is presented and sustained. The thing about invited error, which is sort of the next step up when the opposing party essentially concedes the point and says this is what it is, then nobody looks at it. Nobody bothers to look at it because it's sort of invited, and then we apply an even steeper standard for reversal. So I'm trying to figure out whether we are here in plain error land or invited error land. I mean, I would submit that it's at least plain error and arguably invited error. I mean, and the reason that I'm a little bit uncomfortable with this is that although he did not explicitly object to the pre-sentence reports computation, and indeed his papers implicitly acknowledge that this amount was spent. He did it twice, and I refer again to exhibit to pages 285 and 289 of the excerpt of record. There was, nevertheless, this 11th hour request for an apprendi hearing and then the cross-examination of the victim. And as the court is aware, and this has been alluded to, victims are not ordinarily cross-examined on their victim impact statements, and there is not ordinarily, we see it in medical care cases where there's simply a representation of the victim's medical expenditures, and we don't require explicit itemization of what was lab work and what was doctor bills. Well, let's just go back a little bit in the past just to make sure we're listening. The way I understand these things work in district court, in my experience at least, is that the probation office gathers information from various sources to do the PSR, which includes laws, it includes prior record, it includes circumstances of the crime, it includes family circumstances, a bunch of stuff that goes in the PSR. That's then presented to the district court and the defendant, and defendant can object to various aspects of it. If the defendant objects to any part of the report, the district court must either say, I am not taking that into account, or set it for a hearing to have evidence of the dispute as fact and then make findings. If the defendant does not object, then the PSR is taken as given. It becomes itself enough information in the record to base a sentence on. You don't need further proof because it hasn't been objected to. Essentially, it's in the nature of a stipulation. Is that pretty much what happened here? That is what happened. There was no objection to the pre-sentence report. There was, however, this 11th-hour submission of a request for an apprentice hearing. At the apprentice hearing, he challenges two things. One, the number of victims, whether it's the 50,000 or the big number, and then also they challenged the victim impact statement of the Bank of America guy, saying it was basically hearsay and couldn't be substantiated. So all this was on the table in front of the district court, wasn't it? Well, actually, I don't think we can properly characterize this as an apprentice hearing. He was given an opportunity to do process. They had a hearing. Right. They brought in the Bank of America counsel. So it was clear he was challenging not only the timing of when Bank of America took over and whether there was a succession that could have led to the larger number. That was one point. And then the second point is they challenged really the admissibility or the veracity of his victim impact statement, correct? That's correct, and I think it's also correct that the district court, having listened to the cross-examination and taking into account the entire record, did not find that challenge convincing. But, I mean, so it's hard to say that the issue wasn't on the table. I'm not now talking about whether the district court credited it, but it was on the table before the final sentencing, correct? And in the same setting, it didn't rise to the, I think the chief referred to this as almost like a stipulation, if there's no objection to the PSR. Here there clearly was an objection, right, as to the very point that we're talking about. Was it? What exactly did they say when they asked for a hearing? They asked for a hearing on the issue of whether or not the defendant caused the loss and that really was the total flavor of his arguments. And there was a lot of argument about severing the loss because of the acquisition of Countrywide by Bank of America and whether or not it was foreseeable. But I think, and I read his papers a couple of times, and I really think that in his papers he is acknowledging that this money was spent, but he is debating that it is something that should properly be assessed as a restitution obligation. Well, was the bank's lawyer questioned about how he had arrived at the $1.2 million? Yes, and he was in an uncomfortable position because he was counsel of record on the multi-district litigation. And I know that what opposing counsel has cited is his saying that, I don't know, but he also did say it was a team effort. And there's documentation attached to the victim impact. When he came to court, was he prepared to deal with the question of substantiating the amounts? No. No, and there was really no notice to him that that was going to be debated. I mean, had the initial defense papers questioned the $1.2 million, had the initial defense papers not included the language that I've just paraphrased for the court this morning, I think the government certainly would have come up with the itemization of, well, this was the postage and this was the ink and this was the personnel time. So this is a case where the judge reset the hearing at a certain hour so that he could have two hours for the hearing or however much he wanted, right? So what was the understanding going into the hearing as to, you know, what is this hearing? There's actually some question in the judge's mind about that at the outset of the hearing, and the judge questioned what exactly was the purpose of an extended hearing that he was requesting. The defense had received the pre-sentence report many months before the hearing, and indeed many months before that there were stipulations in the plea agreement that have been discussed this morning. Okay, thank you. Thank you. You're out of time. Do you want to take a minute for a bottle? You can have that. There is a discussion at the entry of the plea itself in which there's a reservation made and a discussion made by defense counsel. Where is this? Excerpt C. Excerpt C. Okay, I got it. On what page? Excuse me, Your Honor. Excerpt C. On page 22, or excerpt 0049, at the very top is a discussion of one of the concerns in the plea agreement is that we did not reciprocate. I'm sorry. Where are you, Your Honor? Excerpt C, 0049. Okay, I'm looking at excerpt C, and it starts, it has a number 28, 0028 at the bottom. That's correct, Your Honor. And we go to what page? 49. 49, okay. And this is during the colloquy, and one of the concerns when he's talking about restitution, and he is objecting to the amount that the government has said, whether restitution is proper, because if, in fact, there are no victims in existence, perhaps there's no restitution to be ordered. There's countrywide or full spectrum at that point in time. So the defense was making it known at that point that he was objecting to restitution. No, what he's saying is there might not be any victims. It's saying there might not be any victims. It doesn't say we dispute the amount. But they never conceded that the amount of $1.2 million. You object to the PSR. That's how you do it. The PSR says $1.2 million loss. The way you do it is you say we object to that, and then you get a hearing on it. That's how it works. If you don't object to it in the PSR, it becomes a fact. I understand, Your Honor. They did object to it. They didn't object to the hearing. No, that was at the entry of the plea. Where do they object? Prior to them getting the hearing. I can't point to the exact site. But that's what got them the hearing. Well, if you can't point to the exact site, I mean, objections are not general things. I mean, you've got to tell us where there was an objection. Opposing counsel says, look, all they objected to was foreseeability. And here there's something about there being no victims. But where is it that you object to the amount? When they had the hearing. At the time of sentencing. Where on the record? If you don't know, you can send us a supplemental. I will, Your Honor. Okay? Okay, thank you. Case is argued. We'll stand some minutes.
judges: Kozinski, McKeown, Smith